**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**James M. BOYD, Defendant-Appellee.**

**No. 76–3847.**

United States Court of Appeals,
Fifth Circuit.

Jan. 26, 1978.

930

Ira DeMent, U. S. Atty., D. Broward Segrest, Asst. U. S. Atty., Robert C. Watson, Montgomery, Ala., for plaintiff-appellant.

Sterling G. Culpepper, Jr., Charles S. Coody, Montgomery, Ala., for defendant-appellee.

Before MORGAN, HILL and FAY, Circuit Judges.

FAY, Circuit Judge:

The defendant, James M. Boyd, was indicted on April 8, 1976, and charged with conducting a gambling business in violation of 18 U.S.C. § 1955 and conspiring to conduct such a business in violation of 18 U.S.C. § 371. The joint trial of Boyd and three co-defendants commenced on April 2, 1976.[1] During the trial, the government introduced into evidence a complete transcript of 282 taped telephone conversations and played to the jury approximately 91 of these conversations. Boyd was a participant in some but not all of the conversations. At the conclusion of the government's case, the court granted judgments of acquittal as to two of the co-defendants. The jury later returned a verdict of guilty as to both counts of the indictment against Boyd and the remaining co-defendant. The court then granted Boyd's motion for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure. The United States has appealed the granting of Boyd's judgment of acquittal.

## I. GOVERNMENTAL APPEAL

We are first met with the threshold issue of whether the United States may appeal pursuant to 18 U.S.C. § 3731[2] from the granting of a judgment of acquittal after the jury has returned a guilty verdict. The defendant contends that this court lacks jurisdiction to entertain such an appeal because reversal of the district court's ruling would run afoul of the Double Jeopardy Clause of the United States Constitution.[3] The defendant cites *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), in support of his contention and seeks to distinguish *United States v. Wilson*, 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), on the basis that *Wilson* involved dismissal of an indictment, as opposed to the granting of a judgment of acquittal, following a jury verdict of guilty. The United States counters with the argument that *Wilson* permits an appeal in the case at bar because reversal of the district court's ruling would result in reinstatement of the guilty verdict and would not subject the defendant to a second trial. The task at hand is to interpret *Wilson* and *Martin Linen* and to apply the principles of these decisions to this case.

In *Wilson*, the jury returned a verdict finding the defendant guilty of converting union funds to his own use in violation of 29 U.S.C. § 501(c). On the defendant's post-

1. The sixteen other co-defendants either entered guilty pleas or were tried prior to commencement of this trial.

2. 18 U.S.C. § 3731 provides:
   In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

3. U.S.Const. Amend. V.

verdict motion, the district court dismissed the indictment on the ground of prejudicial preindictment delay. The Supreme Court held that the governmental appeal of the post-verdict dismissal would not constitute double jeopardy because reversal would reinstate the jury verdict and would not necessitate a second trial.

*Martin Linen* involved the issue of whether the government could appeal from the granting of a judgment of acquittal after a deadlocked jury was discharged. The Court held that a governmental appeal would not lie because, if successful, a second trial would be required.

Our review of *Wilson, Martin Linen,* and other cases involving the issue of whether a governmental appeal violates the Double Jeopardy Clause leads to the conclusion that the propriety of the appeal which we are currently reviewing is governed by *United States v. Jenkins,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). *Jenkins* is factually similar to *Wilson* in that the district court dismissed the indictment following a trial, but differs in that *Jenkins* involved a non-jury trial.[4] The *Jenkins* court clearly and succinctly summarized the holding in *Wilson,* decided the same day, as follows:

> When a case has been tried to a jury, the Double Jeopardy Clause does not prohibit an appeal by the Government providing that a retrial would not be required in the event the Government is successful in its appeal.

*Id.* at 365, 95 S.Ct. at 1011. The Court then proceeded to explain why the Double Jeop-

ardy Clause would not preclude a governmental appeal in a situation such as the one before us.

> When this principle is applied to the situation where the jury returns a verdict of guilt but the trial court thereafter enters a judgment of acquittal, an appeal is permitted. In that situation a conclusion by an appellate court that the judgment of acquittal was improper does not require a criminal defendant to submit to a second trial; the error can be corrected on remand by the entry of a judgment on the verdict. To be sure, the defendant would prefer that the Government not be permitted to appeal or that the judgment of conviction not be entered, but this interest of the defendant is not one that the Double Jeopardy Clause was designed to protect.

*Id.*

We are mindful that the scope of appellate remedies available to the government pursuant to 18 U.S.C. § 3731 is an issue of much import, and with this recognition in mind, wish to briefly relate our holding today to the government's right to appeal under different factual circumstances, as we understand the law. Pretrial dismissals of indictments are appealable because jeopardy has not attached at the time of dismissal. Jeopardy attaches in a jury trial when the jury is empaneled and sworn, and when the court begins to hear evidence in a bench trial. *Serfass v. United States,* 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975). After jeopardy has attached, if the dismissal,[5] acquittal, or declaration of mis-

---

4. We perceive this distinction to be irrelevant for purpose of our decision in this case. The Supreme Court explained in *Jenkins* that the Double Jeopardy Clause of the Fifth Amendment nowhere distinguishes between bench and jury trials, and that the clause applies equally to both types of trials. *United States v. Jenkins,* 420 U.S. 358, 365, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975).

5. We refer only to a dismissal of an indictment or information which "contemplates an end to all prosecution of the defendant for the offense charged," *See Lee v. United States,* 432 U.S. 23, 30, 97 S.Ct. 2141, 2146, 53 L.Ed.2d 80, 87 (1977), and not to dismissals wherein the court

grants the dismissal in contemplation of a second prosecution. For example, in *Lee* the district court dismissed the information after both sides rested because the information failed to charge either knowledge or intent as required by Indiana law, and not because the government failed to prove such knowledge or intent. The Court held that the dismissal was "functionally indistinguishable from a declaration of mistrial," and that retrial under the given facts would not constitute double jeopardy. The dismissal is deemed to be functionally equivalent to a mistrial unless the proceedings terminate "in the defendant's favor." Id. 432 U.S. at 29, 97 S.Ct. at 2145, 53 L.Ed.2d at 87. The proceedings so terminate only if the ruling

trial results from the solution of factual elements of the offense charged, appealability of the order is to be determined solely by application of the Double Jeopardy Clause. The double jeopardy prohibition can only arise when there is a danger of subjecting the defendant to a second trial for the same offense. The government's appeal here is permissible.

## II. MERITS

The defendant Boyd is an admitted gambler who conducted a gambling operation out of his newsstand in Montgomery, Alabama. Boyd's defense is that he engaged in no activity proscribed by 18 U.S.C. § 1955 and 18 U.S.C. § 371 because he was not involved in a gambling business involving five or more persons nor did he reasonably anticipate the involvement of the jurisdictional five. We conclude that the district court erroneously granted the defendant's motion for judgment of acquittal as to each count.

### A. The Substantive Count

The District Court granted a judgment of acquittal as to the substantive count on the ground that the government failed to establish that Boyd was a participant in a gambling operation involving five or more persons as required by 18 U.S.C. § 1955.[6] The government introduced the taped telephone conversations to strengthen its showing that Boyd was involved with at least four other persons in a gambling enterprise. At the conclusion of all of the evidence and after the jury had returned a verdict, the Court ruled that the conversations in which Boyd did not participate were hearsay and thus not admissible against Boyd, and that the conversations in which Boyd did participate failed to establish the involvement of five or more persons. We have concluded that the evidence adduced at trial, independent of the conversations in which Boyd did not participate, is sufficient to establish the jurisdictional requirement. In any event, we also conclude that these conversations are not hearsay and are admissible against the defendant Boyd.

Before turning to the evidence, it is necessary to glean an understanding of the day-to-day operation of a successful gambling operation, as well as the applicable law, because such is essential to connecting or linking individual operators into a common gambling enterprise in cases involving alleged 18 U.S.C. § 1955 violations.

Communication and cooperation among persons who operate gambling businesses minimizes the financial risks associated with gambling and makes gambling profitable for all concerned. See United States v. Schaefer, 510 F.2d 1307 (8th Cir. 1975), cert. denied 421 U.S. 975, 978, 95 S.Ct. 1975, 44 L.Ed.2d 466 (1975); See also United States v. Box, 530 F.2d 1258 (5th Cir. 1976). The

---

"actually represents a ruling, correct or not, of some or all of the factual elements of the offense charged." United States v. Martin Linen, 430 U.S. 564, 571, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977). Of course, when the dismissal is functionally indistinguishable from a mistrial, the government need not appeal but can retry the defendant if manifest necessity required the dismissal order. United States v. Perez, 22 U.S. (9 Wheat.), 579, 580, 6 L.Ed. 165 (1824); See also, United States v. Sanabria, 548 F.2d 1 (1st Cir. 1976), currently pending before the Supreme Court.

Labeling of the order as a dismissal or as a declaration of mistrial, however is not determinative. If the ruling contemplates an end to all prosecution of the defendant, the defendant cannot be retried even though the ruling is erroneously labeled as a declaration of mistrial. See United States v. Lee, 432 U.S. 23, 29, 97 S.Ct. 2141, 53 L.Ed.2d 80, 87 (1977).

6. 18 U.S.C. § 1955 provides in part as follows:
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
(b) As used in this section—
(1) "illegal gambling business" means a gambling business which—
(i) is a violation of the law of a State or political subdivision in which it is conducted;
(ii) involves five or more persons who conduct, finance, manage, supervise, direct or own all or part of such business; and
(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

successful bookmaker makes his profit by collecting a percentage, usually 10%, which losers must pay for the privilege of betting.[7] The bookmaker is in reality a businessman rather than a gambler.[8] The bookmaker utilizes a "line"[9] or point spread on each game for which he is taking bets. Ideally, the bookmaker would like to have exactly the same amount bet on each side of the line so that he will collect 110% of the amount he is required to pay.[10] Overbalance of bets to either side will therefore decrease the chance of the bookmaker reaping the 10% profit. The bookmaker may seek to compensate for the overbalance by "laying off" certain bets to other bookmakers.[11] In addition, it is essential that bookmakers in a given area utilize "lines" which are consistent to prevent sophisticated bettors from placing bets with two bookmakers, on opposite sides, with little risk of loss for the bettor and in effect pitting the bookmakers against each other.[12]

■ The law in this Circuit is settled that the mere fact that two bookmakers occasionally exchange line information or "lay off" bets does not itself warrant a finding that the bookmakers are engaged in a common gambling business. *United States v.*

---

7. As this Court explained in *United States v. Milton,* 555 F.2d 1198 (1977), the percentage collected by the bookmaker is commonly referred to as "juice" or "vigorish".

8. *See United States v. Milton,* 555 F.2d 1198, 1200 (1977).

9. We would be remiss if we did not acknowledge the fact that some of the other panels that have explained the setting of a line have felt compelled to praise, lament, or make light of the successes and failures of some of the various teams in the National Football League. For example, Judge Wisdom, a resident of New Orleans, termed it an "unlikely assumption" that the New Orleans Saints could ever be a seven point favorite over the Los Angeles Rams. *See United States v. McCoy,* 539 F.2d 1050, 1059 (5th Cir. 1976). Not to be outdone—and seldom to be found without his sense of humor—Judge Goldberg of Dallas used the Dallas Cowboys versus the Washington Redskins as his instructional aid. In so doing, Judge Goldberg termed the possibility of the Redskins being favored over the Cowboys as "faint", and then proceeded to "needle" the residents of our nation's capital by implying that all Redskins fans must be "irrational". Judge Goldberg did, however, throw a "crumb" to the Redskins followers by giving credit to the recognized talents of Billy Kilmer. *See United States v. Milton,* 555 F.2d 1198, 1200 (5th Cir. 1977).

Being somewhat more secure about the rightful place of the Miami Dolphins in the annals of professional football, we do not feel compelled to enter this colloquy. In fact, we recognize that little could be added to better cement the achievements of the Dolphins, their coach Don Shula, and their outstanding quarterback Bob Griese in the record books of professional football. *See, e. g.,* Super Bowl VIII; Super Bowl VII; *cf.* Super Bowl VI. The members of this panel from Georgia point to the Falcons' best NFL defensive record in modern times; Coach Bennett's election as Coach of the Year; and, further, saith not.

10. *See United States v. Milton,* 555 F.2d 1198, 1200 (5th Cir. 1977).

11. A bookmaker can compensate for an overbalance of bets by betting on the more popular of the two teams in the amount by which bets on that team exceed the sum bet on the disfavored team at a given point spread. If the popular team wins, the bookmaker will pay out to his bettors more than he took in, but will offset this disbursement by his own winnings. Thus, the bookmaker has "balanced" his books and has assured himself of his 10% profit.

12. This phenomenon was explained in *United States v. McCoy,* 539 F.2d 1050 (5th Cir. 1976). The Court in *McCoy* used as an example a football game between the New Orleans Saints and the Los Angeles Rams, and then explained:

It is important to all bookmakers that each [bookmaker] in a relevant market set a line close to all the other lines. If a particular bookmaker should give the Rams 7 points when all other bookmakers in the area give the Rams 5 points, all rational and informed bettors will bet with the particular bookmaker who was out of line, and all Saints bettors will bet with the others. Indeed, the same bettor may bet with both bookmakers, on opposite sides, in a process called "middling" or "over and under" betting. This is a form of arbitrage. The effect of middling would be to play off one bookmaker against another with little risk and a likelihood of gain for the bettor. Although this situation is theoretically remediable by laying off, that process might not work in particular circumstances. In any event, such a situation is bound to create confusion. It is conducive to the smooth operation of bookmaking in an area, then, to establish and maintain a line from which bookmakers vary but little. *Id.* at 1059, 1060.

*Milton,* 555 F.2d 1198 (5th Cir. 1977). Two bookmakers can be linked under 18 U.S.C. § 1955, however, if it is shown that:

. . . . the receipt of line information by one bookmaker substantially affects the other's business or that there is a constant exchange of line information between the two. . . . 555 F.2d at 1201.

Similarly, the court held that:

. . . . bets between bookmakers may be personal wagers that are not lay off bets. On the other hand, evidence of a consistent pattern of lay off betting or exchanging line information between two bookmakers may establish the essential link between them for purposes of § 1955. Id.

In *United States v. Box,* 530 F.2d 1258, 1266 (5th Cir. 1976), this court was also confronted with the issue of whether independent gambling businesses could be linked for the jurisdictional requirement of § 1955. The court stated:

. . . . the regular direct exchange of lay off bets and line information can connect otherwise independent gambling operations, which alone would be illegal under state law but not federal law (because less than five participants were involved) into one business.

The law is equally clear that all those who participate in a gambling business, whether as telephone clerks, collection agents, or runners are includable in satisfying the five person requirement. The only persons not included within the ambit of § 1955 are the individual bettors who place bets with the bookmaker. *United States v. Joseph,* 519 F.2d 1068, 1071 (5th Cir. 1975), *cert. denied,* 424 U.S. 909, 96 S.Ct. 1103, 47 L.Ed.2d 312 (1976).

With these principles in mind, we turn to the question of whether the evidence, viewed most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), was sufficient to support the jury's conclusion that beyond a reasonable doubt Boyd was involved with at least four other persons in the operation of a gambling business.[13]

The defendant Boyd testified that during the period covered by the indictment, an individual named Dan McKinley disseminated line information for him and collected bets from some of his bettors. Boyd's testimony reveals that he regularly conveyed line information to one James Carl Wright, accepted lay off bets from Wright on approximately eight or ten occasions, loaned money to Wright, and turned some of his bettors over to Wright. In fact, Boyd testified that he had an agreement with Wright whereby Boyd would accept lay off bets from four of Wright's customers, even though Boyd was unaware of the amount of the bets. The defendant contends, nevertheless, that although he and McKinley were involved in the same business, he was not connected with Wright and his operation. Under the law as we have outlined in this opinion, we feel that the evidence was sufficient for the jury to conclude that beyond a reasonable doubt Boyd and Wright were involved in a common gambling business.

The involvement of Boyd, Wright and McKinley in the common gambling business satisfies three-fifths of the jurisdictional requirement. The uncontradicted testimony of Leon Howard, a government witness, is sufficient to convince the jury of the involvement of a fourth participant. Howard

13. The standard to be applied in determining whether the district court properly granted a judgment of acquittal after a jury verdict of guilty is set forth in *United States v. Warner,* 441 F.2d 821 (5th Cir. 1971), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The court stated:

On a motion for judgment of acquittal, the test is whether, taking the view most favorable to the Government, a reasonably minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *Sanders v. United States,* 5 Cir. 1969, 416 F.2d 194, 196; *Jones v. United States,* 5 Cir. 1968, 391 F.2d 273, 274; *Weaver v. United States,* 5 Cir. 1967, 374 F.2d 878, 881.

*Id.* at 825.

testified that he relayed bets from third parties to Boyd from his barber shop. The following testimony was elicited from Howard on direct examination:

Q: You would call bets in to Mr. Boyd for yourself and other people that would come into your shop?

A: Right.

On redirect, Howard testified as follows:

Q: Mr. Howard, how long was it you said you had been doing business with Mr. Boyd?

A: Well, I can't recall that, how long I have been doing, but I know when he, you know, since he has been up there.

Q: Four or five years?

A: Well, I don't know if it is four or five or how many years. I have known him ever since '75, somewhere along in there.

Q: All right. And now when you would be calling in bets for those other people and Mr. Boyd would call you about it how much money would you sometimes owe Mr. Boyd for these bets?

A: Well, the last one he called me, I owed him two hundred dollars.

Although Howard also placed personal bets with Boyd, the personal betting does not absolve Howard of his participation in Boyd's business. Howard's role was factually indistinguishable from that of Boyd's runner, Dan McKinley, who concededly helped Boyd to conduct his gambling business.

The parties have vigorously contested the issue of whether Boyd relied upon an outside line source or whether Boyd created his own line from newspapers and sports magazines. The government introduced expert testimony that the relatively small bookmakers inevitably utilize an outside line. The defendant flatly denied the existence

of the outside source. We need look no farther than two taped conversations in which Boyd participated [14] to find evidence from which the jury could conclude that Boyd utilized an outside line source, thereby satisfying the jurisdictional requirement of the statute in question. In a conversation between Boyd and Wright which occurred on November 20, 1975, the following colloquy transpired:

Wright: I meant to ask you when I was over there earlier, did you ever get anything else on the pros?

Boyd: I ain't got a thing yet, I'm waiting on them to call me.

Wright: All right. I'm at home, hear? Thank you.

In a conversation later the same day, Boyd again made statements from which the jury could conclude that Boyd received line information from an outside source. The pertinent part of the conversation is as follows:

Wright: James, what you got on number 35?

Boyd: Bunch of changes; man writing them down now. What?

Wright: # 35?

Boyd: West Virginia 6, it might have changed, I've got a bunch of changes. If you'll hold the phones he's waiting.

We therefore hold that even without consideration of the taped conversations in which Boyd was not a participant, the evidence was such that the jury could conclude beyond a reasonable doubt that Boyd was involved with Wright, McKinley, Howard, and an unknown line source in the operation of an illegal gambling business. Additionally, the taped conversations in which Boyd was not a participant are not hearsay but admissible as verbal acts.[15]

14. The district court did not hold that these conversations were hearsay, and the defendant has not so characterized them.

15. "Hearsay is a statement . . . offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). None of the tapes or conversations were offered to prove the truth of any statements, made therein. The

defendant's position also ignores the provisions of Fed.R.Evid. 801(d)(2)(E) dealing with statements of co-conspirators made during the course of and in furtherance of a conspiracy. This provision may also permit the admission of some of these taped conversations. For instance, the evidence was overwhelming as to Wright's conspiring with Boyd in a common gambling operation within the meaning of *Unit-*

Consequently, the jury could have found that Boyd was involved with a number of persons, in addition to those named above, in the operation of a business prohibited by 18 U.S.C. § 1955.

The triggering mechanism upon which the hearsay objection depends is that the out-of-court statement must be offered to prove the truth of the matter asserted. The Federal Rules of Evidence, incorporating this concept, define hearsay as follows:

> . . . . a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

Fed.R.Evid. 801(c).

In the case at bar, the government introduced the tape recordings to show the scope of the gambling operation in which Boyd and Wright were involved. The recordings were not offered to prove the truth of the line information or the truth of the contents of any of the conversations, but merely to prove that the conversations occurred. The conversations are not hearsay but constitute verbal acts and can be considered part of the offense in question.[16] See, e. g., United States v. Burke, 495 F.2d 1226 (5th Cir. 1974), cert. denied, 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974).

A jury verdict should be overturned with great hesitancy. Viewing this evidence most favorably to the verdict, as we must, we conclude that such action as to the substantive count was inappropriate in this case.

### B. The Conspiracy Count

The district court granted Boyd's motion for judgment of acquittal because "the Government failed to adduce any evidence that Mr. Boyd 'reached an agreement with one or more others to conduct an illegal gambling business which reasonably an-

ticipated the involvement of five or more persons.' United States v. Pepe, 512 F.2d 1129, 1131 (3rd Cir. 1975)."

We have concluded that the district court applied an incorrect legal standard in granting the judgment of acquittal, and therefore reverse the judgment of the district court.

The district court's reliance on Pepe was misplaced. In Pepe the Third Circuit held that in order to sustain a conviction for conspiracy to violate 18 U.S.C. § 1955 the government must prove beyond a reasonable doubt that the defendant reached an agreement with one or more persons to conduct an illegal gambling business with the knowledge or reasonable anticipation that at least five persons would be involved.[17]

The holding in Pepe that greater knowledge or intent is required for conviction of conspiracy to violate 18 U.S.C. § 1955 than for conviction of the substantive violation was weakened by the Supreme Court in United States v. Feola, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), and given the death knell in several recent cases involving conspiracy to violate 18 U.S.C. § 1955.

In Feola the defendant was convicted of assaulting federal officers while the officers were in the performance of their official duties and of conspiracy to commit the offense in violation of 18 U.S.C. § 371, the general conspiracy statute. The Supreme Court held that because knowledge that the victim was a federal officer is not required for conviction of the substantive offense of assault, knowledge is not required to support a conspiracy conviction. The Court relied upon the policies underlying the law of conspiracy—protection of society and the need for governmental intervention to pre-

---

ed States v. Milton, 555 F.2d 1198 (5th Cir. 1977).

**16.** Boyd cannot find solace in his argument that the conversations in which he did not participate are inadmissible because they are irrelevant. The conversations are highly relevant as to Boyd because they provide probative

evidence from which the jury could conclude that the operation was large in scope.

**17.** The court in Pepe recognized, however, that knowledge of participation of the jurisdictional five is not required for conviction of the substantive offense.

vent the crime from evolving into fruition—in refuting the knowledge requirement. These policies would not be sowed by requiring an awareness of the status of the person assaulted as a condition precedent to governmental intervention. Therefore, knowledge that the intended victim is a federal officer is not an element of conspiracy to commit the offense. ·

The rationale of *Feola* was extended to a case involving conspiracy to violate 18 U.S.C. § 1955 by the Sixth Circuit in *United States v. Leon,* 534 F.2d 667 (6th Cir. 1976). This Circuit adopted the reasoning of *Leon* in *United States v. Alfonso,* 552 F.2d 605 (5th Cir. 1977).[18] As Judge McCree discussed in *Leon* :

> Applying the rationale of the *Feola* case to the statute before us, we reach a similar conclusion. The special purposes underlying the imposition of criminal liability for conspiracy, as well as for the substantive offenses, require no greater specific knowledge for conspiracy to violate § 1955's prohibitions than for the substantive offense prohibited by § 1955. Like the Court in *Feola,* we find that the danger to society does not differ depending upon whether the defendant was specifically aware of the fact that five or more persons would be involved in the illegal gambling enterprise he agreed to join. Nor does focusing upon the right of society to take preventive action once criminal intent has crystallized and some action has been taken toward the illegal goal justify distinguishing between a defendant who knew that the gambling enterprise in question would be operated by five or more persons, and one who was ignorant of this specific fact.

534 F.2d at 675.

Having determined that the district court erred in granting the judgment of acquittal on the basis of lack of proof of Boyd's reasonable anticipation of the participation of five or more persons, we need only determine whether the evidence was sufficient to warrant a finding that Boyd entered into an agreement with one or more persons to conduct a gambling business violative of state law. We hold that from the evidence viewed in the light most favorable to the government, the jury could have concluded that the defendant Boyd entered into such an agreement with either James Carl Wright, Dan McKinley or with both individuals. The judgment of acquittal as to the conspiracy count, is therefore, reversed.

The defendant contends that in the event the judgments of acquittal are reversed on appeal, the jury verdicts cannot be reinstated and the case must be retried because of error committed by the district court. The defendant alleges that the district judge committed error by making a prejudicial statement to the jury and by allowing into evidence certain testimony of a government expert witness. As these matters have not been presented to the trial court, we decline to consider these contentions at this time. On remand, we direct the trial judge to

---

**18.** In particular, the Sixth Circuit in *Leon* stated:

> We also hold that in the case of a conspiracy conviction, it is not essential to show that any defendant knew that the gambling business would involve five or more persons. We are aware that at least one circuit has held that a defendant must be shown to have agreed to take part in a gambling business that he knew would involve five or more persons in order for a conviction for violation of § 1955 to stand. *United States v. Pepe,* 512 F.2d 1129, 1131–1132 (3d Cir. 1975). However, we do not agree with this decision, and the Third Circuit itself has now repudiated its rationale. *United States v. Johnson,* 514 F.2d 431, 432 (3d Cir. 1975); *United States v. Starks,* 515 F.2d 112, 124 (3d Cir.

1975). *Pepe* was based upon *United States v. Alsondo,* 486 F.2d 1339, 1343 (2d Cir. 1973), which has since been reversed by the Supreme Court *sub nom., United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

534 F.2d 667, 674 (6th Cir. 1976). In *United States v. Alfonso,* 552 F.2d 605 (5th Cir. 1977) we explained:

> Appellants first contend that the court erred in failing to instruct the jury that the defendants must be aware that the conspiracy must involve at least five participants. It is well settled, however, that the "five persons" criterion of § 1955 is a jurisdictional requirement unrelated to the criminal character of conduct.

*Id.* at 617.

reinstate the guilty verdicts and proceed with sentencing. The defendant can file whatever post-trial motions he deems appropriate. Thereafter, should the defendant find it necessary to pursue these matters, he can do so by appeal.

Reversed and remanded.