IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 93-7648
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALVIN WAYNE HEACOCK, JR., a/k/a
"Johnny B. Williams,"

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Mississippi

_____
(August 24, 1994)

Before KING, JOLLY, and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Alvin Wayne Heacock, Jr. appeals his criminal convictions for various illegal gambling related offenses. He argues eleven points of error, but most have little merit. We therefore focus our attention on (A) Heacock's sufficiency of the evidence challenge to his conviction under 18 U.S.C. § 1955--operation of an illegal gambling business--and (B) Heacock's legal challenge to his conviction under 18 U.S.C. § 1952--interstate travel in aid of racketeering. We hold that the judgment of conviction is error-free, and therefore affirm.

I

Heacock was a bookie in Hattiesburg, Mississippi. Heacock controlled a fairly large gambling operation, with several "associates" operating bookmaking offices for him in several cities. Many of Heacock's gambling partners testified at trial concerning Heacock's gambling business. The evidence showed how bets were made, what types of bets were made, and how money was moved between cities. Further, there was testimony to show that Heacock and his associates took deliberate steps to avoid the paper trails of the gambling operations, that Heacock had a practice of "hiding" money--in the floor at one of his apartments and in alias-named safety deposit boxes--and, finally, that Heacock's real profits differed significantly from his reported profits.

In addition to the testimony from Heacock's gambling comrades, the government produced evidence from a police search of Heacock's residence that was conducted on December 17, 1990. As a result of that search--and as the result of a 1985 raid on Heacock--the government obtained a great deal of evidence that Heacock was conducting illegal gambling. Part of the evidence included cassette recordings of illegal bets being made. Further, the government introduced into evidence police photographs of the scene at Heacock's residence. In any event, this generally overwhelming evidence concerning Heacock's gambling operations, served as the basis for Heacock's indictment in October of 1992 and his ultimate conviction.

## II

Heacock was indicted in the Northern District of Mississippi in an 11-count indictment charging: a scheme to conceal from the IRS in sixteen different ways the nature and extent of his bookmaking operation between 1980 and 1992 in violation of 18 U.S.C. § 1001 (Count 1); a conspiracy to impede the IRS from learning his sources and amounts of gambling income and his cash transactions in violation of 18 U.S.C. § 371 (Count 11); conducting an illegal gambling business with five or more persons from October 2, 1987 to January 22, 1988, in violation of 18 U.S.C. § 1955 (Count 2); using the mail on four occasions to distribute gambling proceeds in violation of 18 U.S.C. § 1952 (Counts 3-6); and, finally, laundering proceeds of State RICO violations involving gambling in violation of 18 U.S.C. § 1956 (Counts 7-10).

On Heacock's motion under Fed. R. Civ. P. 18, trial was moved from Oxford, Mississippi to Hattiesburg, his city of residence, 250 miles away in the <u>Southern</u> District of Mississippi. After trial--conducted from May 24 through June 2, 1993--the jury convicted Heacock on all counts. On October 6, 1993, the district judge, after finding Heacock had threatened the family of the detective investigating him, had understated his income by over $600,000.00 and was still concealing substantial assets, nevertheless, departed downward substantially from the guidelines and sentenced Heacock to serve 60 months concurrently on each count and to pay a $450,000 fine. Heacock filed a timely notice of appeal.

III

A

On appeal, Heacock argues that there was insufficient evidence to support his conviction under 18 U.S.C. § 1955 for operating an illegal gambling business. In reviewing challenges to sufficiency of the evidence, this court views the evidence in the light most favorable to the jury verdict and affirms if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt. United States v. Ruiz, 987 F.2d 243, 249 (5th Cir.), cert. denied, 114 S.Ct. 163; 126 L.Ed.2d 123 (1993). All credibility determinations and reasonable inferences are to be resolved in favor of the jury's verdict. See id.

Section 1955 defines "illegal gambling business" as

a gambling business which--
    (i) is a violation of the law of a State or political subdivision in which it is conducted;
    (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
    (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in a single day.

18 U.S.C. § 1955(b)(1) (emphasis added). Heacock argues that the government failed to prove that five or more persons were involved in aiding the conduct of Heacock's illegal gambling business between October 2, 1987 and January 22, 1988, as charged in the indictment. We find, however, that the evidence sufficiently established the "jurisdictional five."

To be counted as a part of the jurisdictional five, a person or entity must have provided services "necessary or helpful" to the gambling operation. Participants have included everything from layoff bettors[1] and line services[2] to waitresses who serve drinks. Only regular bettors are excluded from the count. See United States v. Boyd, 566 F.2d 929, 934-35 (5th Cir. 1978).

(1)

The record reveals that in addition to Heacock, at least four other persons were involved in the operation of the illegal gambling business. The first was Dr. Jeffrey Topping, who was a psychology professor at Mississippi State University in Starkville, Mississippi, and who testified that from 1980 until gambling raids on his home in March 1988, he operated a bookmaking office for Heacock in Starkville. Heacock received his bets from "associates" like Topping--a service that no doubt was necessary or helpful to

---

[1]A bookie is not himself a bettor, but rather is a businessman who makes his profit from collecting a percentage, usually 10%, from the loosing bettors who bet through him. This percentage collected by the bookmaker is called "juice." In order to keep from risking his own money, a bookmaker must take bets from an equal number of winning and losing bettors. That way, he will collect 110% of the amount he must pay out. When a bookie has more bets on one side, and needs more on the other in order to balance his books, the bookie will "layoff" bets to another bookie.

[2]A bookmaker utilizes a "line" or point spread on each game for which he is taking bets. As previously noted, the bookmaker must have exactly the same amount bet on each side of the line so that he can collect his full percentage charge from each losing bet placed with him. Further, it is important for bookmakers to have up-to-the-minute, accurate lines so that bettors cannot play one bookmaker against another who may be giving a different line.

Heacock's operation—and no one disputes that Topping was involved during the count two period. Heacock and Topping make two of the jurisdictional five.

(2)

Next, United Productions, a line service from Las Vegas can be counted as the third member of the jurisdictional five.[3] According to testimony from bookmaking expert Tommy Patterson, up-to-date professional line services are essential to a large bookmaker like Heacock in operating a profitable gambling business. United Productions was just such a service, providing "up to the second, up to the minute" lines on current games to anyone who called them on their "900" number. An analysis of Heacock's long-distance toll records reflected 64 separate calls from Heacock's telephone numbers to United Production's "900" number line service during the count two time period. United Productions was an essential part of Heacock's gambling operations and is the third member of the jurisdictional five.

(3)

The fourth member of the jurisdictional five is another line service from Las Vegas, known as J&J Sports Services ("J&J"), owned by Christine Fenton. Fenton testified at trial, and she exhibited a ready familiarity with Heacock and his business. She knew

---

[3]"[T]he regular direct exchange of . . . . line information can connect otherwise independent gambling operations." See United States v. Boyd, 566 F.2d at 935 (5th Cir. 1978).

-6-

Heacock as "Wayne - # 793," a long-time client, and her only client in Hattiesburg, Mississippi. She produced business records showing Heacock's address in Hattiesburg, and she testified that Heacock used her service in all seasons except summer baseball season, which was consistent with the testimony of other witnesses who knew Heacock's gambling practices.

Heacock challenges J&J as a member of the jurisdictional five, however, arguing that there is no evidence to show that he used J&J's line service during the count two time period, from October 1987 through January 1988. We find that the evidence is sufficient to support the conclusion that J&J provided service to Heacock throughout the relevant period. First, there was direct evidence from Fenton herself that Heacock began using her service in September of 1986, "[t]o the best of [her] knowledge."

Fenton's testimony was supported by other evidence that showed that Heacock used J&J both before and after the relevant time period, suggesting that it was far more likely than not that J&J was also involved during the relevant period of time, inasmuch as no reason was offered for the exclusion of such a gap in time. Fenton testified that Heacock paid her three hundred dollars per month for use of her line service (which was different from United Productions who charged its customers via a "900" toll telephone number), and one of Heacock's former assistants recalled that Heacock paid three hundred dollars per month for line updates during the time that she worked for him, before the count two

period.  An actual three hundred dollar money order from "Wayne - #793" was produced as documentary evidence to show that Heacock used J&J's service after the relevant time period.

Finally, there was testimony explaining that it would make sense for a bookmaker to have more than one line at any given time period, for example, both J&J and United Productions.  In sum, there was both direct and circumstantial evidence to show that Heacock used J&J Sports Services during the count two period.  We find that evidence sufficient to support the conclusion that J&J Sports Services was the fourth member of the jurisdictional five.[4]

(4)

The fifth member of the jurisdictional five can easily be found in reviewing the testimony about a man named Benny Cook.  Cook, without dispute, took telephone bets using the name "Johnny" at the time of the 1990 search of Heacock's residence.  Bookie Mike Sheffield and bettor Russell Stogner testified that during the

---

[4]In further arguing that the evidence was insufficient to conclude that J&J provided service to him during the count two period, Heacock points to the absence of any relevant documentary proof.  More specifically, Heacock points to the lack of phone records showing calls to J&J.  Because the other evidence sufficient in itself to support the conclusion that J&J was involved in Heacock's gambling business throughout the count two period, it is irrelevant that the government did not produce yet another piece of documentary evidence.  We note, however, that the government offered a perfectly reasonable explanation for the lack of phone records:  Unlike United Productions, which charged callers via a "900" telephone number, J&J charged a monthly flat rate.  According to the government, customers of J&J then called an "800" number to reach the service, and "800" numbers do not appear on phone bills.

count two period a man other than Heacock took telephone bets using the name "Johnny." Further, Sheffield testified that the man called "Johnny Williams" was really Bennie Cook. It is true that when Sheffield was asked how he knew that Johnny was Bennie, he responded in a less than coherent fashion,[5] but the direct evidence is nonetheless sufficient to find that Bennie Cook took telephone bets for Heacock, using the name Johnny Williams, during the count two period.[6]

---

[5]The following exchange took place on direct examination of Sheffield:

    Q.    Do you know who Johnny Williams is?
    A.    Yes.
    Q.    Who is it?
    A.    Bennie Cook.
    Q.    And how do you know that?
    A.    I don't --
    Q.    Did you ever meet him?
    A.    No.  I talked to him over the phone.  Then I
          finally met Bennie and Johnny, yeah.  He told me
          that was who had been answering the phone.
    Q.    Who told you that was who had been answering the
          phone?
    A.    I think Bennie did.

[6]We could continue this count if needed:  For example, Mike Sheffield, himself a bookmaker, testified, unequivocally, that he placed layoff bets with Heacock during the count two period.

    Q.    . . . I'm going to ask you two questions:  First of
          all, did you ever personally bet with Wayne
          Heacock?
    A.    Yes.
    Q.    Did you ever lay off bets to balance out your
          bookie business with him?
    A.    At times.
    Q.    At times.  Okay.  Specifically, I want to ask you
          for the time period October 2nd, 1987, through
          March of 1988 did you ever lay off bets with the
          defendant during that period?
    A.    At different times, yes.

In sum, we find sufficient evidence to support the conclusion that Wayne Heacock, Jeffrey Topping, United Productions, J&J Sports Services, and Benny Cook all participated in Heacock's illegal gambling business by providing him with necessary or helpful services during the period from October 2, 1987 through January 22, 1988, and we therefore affirm Heacock's felony gambling conviction under 18 U.S.C. § 1955.

B

The next issue presented is one of first impression in this circuit:   Are intrastate mailings sufficient to invoke federal jurisdiction under 18 U.S.C. § 1952.  This question is one of law, which we will review de novo.  In re Allison, 960 F.2d 481, 483 (5th Cir. 1992).

Heacock was convicted on counts three, four, five, and six of the indictment for using the mail in the aid of a racketeering

---

    Q.   At different times?
    A.   Yes.
    Q.   But including that period of time?
    A.   Yes.
    Q.   And what would be the reason for you laying off
         with him?

    A.   If he had a better number on a game or if I was
         overloaded on a game, I would call and place a bet
         through him.

Given that Sheffield testified that he regularly placed layoff bets with Heacock, and did so during the count two period, Sheffield could be counted as the fifth participant in Heacock's illegal gambling business.

enterprise.  Specifically, Heacock was charged with and convicted of

> willfully caus[ing] the use of the United States mail,
> with intent to distribute the proceeds of a business
> enterprise involving gambling, that is defendant, as
> apart of his bookmaking operation, did direct Jeff
> Topping [his associate in Starkville, Mississippi] to
> send . . . gambling proceeds to a bookmaker in Natchez,
> MS.

Heacock argues that he cannot be convicted under 18 U.S.C. § 1952, as a matter of law, for any intrastate mailings.

The mailings in question occurred between October 1987 and January 1988.  At that time, section 1952 provided:

> Whoever travels in interstate or foreign commerce or uses
> any facility in interstate or foreign commerce, including
> the mail, with intent to--
>> (1) distribute the proceeds of any unlawful
>> activity; or
>> (2) commit any crime of violence to further any
>> unlawful activity; or
>> (3) otherwise promote, manage, establish, carry on,
>> or facilitate the promotion, management,
>> establishment, or carrying on, of any unlawful
>> activity,
> and thereafter performs or attempts to perform any of the
> acts specified in subparagraphs (1), (2), and (3), shall
> be fined not more than $10,000 or imprisoned for not more
> than five years, or both.

18 U.S.C. § 1952(a) (emphasis added).[7]

---

[7]Section 1952 was amended in 1990 by relocating the reference to the mail as follows:

> Whoever travels in interstate or foreign commerce or uses
> the mail or any facility in interstate or foreign
> commerce with intent to . . . .

-11-

The Second and Sixth Circuits have addressed this statutory question and have reached opposite conclusions.[8]  The Sixth Circuit in <u>Barry</u> concluded that an intrastate mailing was not sufficient to invoke federal jurisdiction.  <u>Barry</u>, 888 F.2d at 1095.  The Sixth Circuit found it significant that the statute made reference to facilities <u>in</u> interstate commerce, as opposed to facilities <u>of</u> interstate commerce.  The Sixth Circuit concluded that the word "of" merely "identifies the facilities referred to," whereas, the word "in" "require[s] a particular use of a facility."  <u>Id.</u>  The Sixth Circuit also found support for its reading in the legislative history of the act.

The Second Circuit in <u>Riccardelli</u>, on the other hand, concluded that "Congress intended <u>any</u> use of the United States mails to be sufficient to invoke federal jurisdiction under the Travel Act."  <u>Riccardelli</u>, 749 F.2d at 830.  The Second Circuit reasoned that a plain reading of the Act revealed that the mailing did not need to be interstate:  "The positioning of the phrase `including the mail' in the statute singles out the mail for special treatment and thus consistent with the historical understanding of the United States mail, equates the use of the mail with the use of other facilities of interstate and foreign commerce; it does not indicate that the mailing itself must be interstate."  <u>Id.</u> at 861.  The Second Circuit, like the Sixth

---

[8]<u>See</u> <u>U.S. v. Barry</u>, 888 F.2d 1092 (6th Cir. 1989); <u>U.S. v. Riccardelli</u>, 794 F.2d 829 (2d Cir. 1986).

Circuit, found that the legislative history of the statute supported its reading of the statute. Id. In sum, the Second Circuit found the phrase "intrastate mails" to be an "oxymoronic juxtaposition." Id. at 830.

We agree with the result reached by Second Circuit: Section 1952 criminalizes any use of the United States mail with the intent to distribute the proceeds of an unlawful activity. Section 1952 punishes "whoever . . . uses any facility in interstate or foreign commerce, including the mail." Our reading of this language leads us to conclude that the use of "the mail" clearly embodies and includes the use of the United States Post Office, which is a "facility in interstate commerce." In other words, whenever a person uses the United States Post Office to deposit, to transport, and to deliver parcels, money, or other material by means of the mail, that person clearly and unmistakably has used a "facility in interstate commerce," irrespective of the intrastate destination of the item mailed. Accordingly, we hold that any use of the United States mails in this case is sufficient to invoke jurisdiction

under 18 U.S.C. § 1952,[9] notwithstanding the intrastate destination of the mailings.[10]

C

Finally, in addition to the more substantive complaints discussed above, Heacock argues that the district court committed a gaggle of other errors.  We have reviewed each of Heacock's arguments and have concluded that the district court committed no reversible error in the present case.  Accordingly, we affirm the district court on all of the following issues:

(1)

First, Heacock complains that the prosecutor told the jury in opening statement that Heacock furnished drugs to his ex-

---

[9]This holding is consistent with our opinion in United States v. Edelman, 873 F.2d 791 (5th Cir. 1989).  In Edelman, although we did not specifically address the issue that is before us today, we assumed that the mailing in that case invoked federal jurisdiction, without even discussing whether the mailing was "interstate" or "intrastate."  See id. at 794-95.

[10]Heacock also argues on this point that the evidence was insufficient to show that he caused the mailings.  It is clear from the record, however, that Heacock did instruct Topping to send the particular checks.  Thus, there is no lack of evidence to support the finding that Heacock caused the exchanges.  Further, Heacock argues that Topping never testified that Heacock told him to mail the checks, only to send them.  The government must only show, however, that the mail was actually used--there is no requirement that Heacock intended for the mail to be used or even that he knew the mail was used.  See Edelman, 873 F.2d at 795.  It is clear from the record that the mail was used in the present case, thus, there is sufficient evidence to uphold Heacock's convictions under § 1952.

-14-

girlfriend, Lisa Cunningham.[11] Heacock says that this statement was totally false. Further, according to Heacock, the court's curative action was ineffective and implied that Heacock was using drugs. The essence of the government's opposition to this appeal is that, to begin with, there was no prosecutorial misconduct in making this true statement, and that given the overwhelming nature of the evidence, an isolated mention of drugs had no impact whatsoever on the outcome of the trial.

A motion for mistrial based on an alleged prejudicial comment by the prosecution, is reviewed under the abuse of discretion standard. U.S. v. Bentley-Smith, 2 F.3d 1368, 1378 (5th Cir. 1993). The test for assessing claims of prejudice from prosecutorial conduct is (1) the degree of initial prejudice; (2) the effectiveness of corrective measures; and (3) the strength of the government's other evidence. U.S. v. Georgalis, 631 F.2d 1199 (1980), and U.S. v. Semensohn, 421 F.2d 1206 (2d Cir. 1970). In the light of the government's overwhelming evidence of guilt, and in the light of the fact that the jury heard only one sentence concerning drugs from the prosecutor, followed by a very clear instruction that drugs were irrelevant to the case, it is clear to us that the district court did not abuse its discretion by failing to award a mistrial in this instance, even if we assume that the prosecutor's statement amounted to prosecutorial misconduct.

_____

[11]His actual statement was that "[Heacock] introduced [Cunningham] to narcotics."

Heacock's next complaint of prosecutorial misconduct involves a revolver. In the 1990 search, according to Heacock, the police removed a revolver from a lower desk drawer, placed it into an upper desk drawer, and partially opened the drawer so that they could make a photograph of the revolver. At trial, Heacock objected to Officer Cox's testifying that there was a revolver in the desk drawer, and the court sustained Heacock's objection. At that time, the prosecutor informed the court that photographs of the revolver in the desk were included in a series of photographs of the 1990 search, and asked, "Should we cut out the ones with the firearms in them?" The court responded, "Yes."

The photographs were later introduced into evidence. Instead of removing all of the pictures that included the revolver, however, the prosecutor "amended" one picture by cutting the revolver out of the photograph. The photographs, including the "amended" one, were immediately published to the jury. Heacock moved for a mistrial, and, in response, the "amended" photograph was withdrawn from the exhibits.

Again, the test for assessing claims of prosecutorial misconduct require that we determine whether the alleged misconduct was prejudicial in the light of the other evidence from trial. We conclude that the introduction of one "amended" photograph, which was later withdrawn from the exhibits, could not be prejudicial in

this case with such an overwhelming set of incriminating facts. There was no abuse of discretion here.

(3)

Heacock next argues that all of the evidence introduced at the trial that was obtained from the 1985 search of his residence should have been suppressed because the indictment was brought more than five years after the evidence was obtained. See 18 U.S.C. § 3282.[12] We have previously held, however, that section 3282 "is a defense to prosecution, not a rule of evidence." United States v. Ashdown, 509 F.2d 793, 798 (5th Cir. 1975). Furthermore, the statute of limitations does not begin to run on a "scheme" crime (count one charged a scheme to conceal in violation of 18 U.S.C. § 1001), until each overt act constituting the scheme has occurred, because the case cannot be brought and proved until that time. United States v. Girard, 744 F.2d 1170 (1984) (if any overt act that furthers the purpose of a conspiracy occurs within the limitations period, including an act of concealment, then the indictment is timely).

---

[12]Section 3282 provides that

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

18 U.S.C. § 3282.

In the present case, the prosecution coupled the 1985 evidence that Heacock was involved in gambling with other proof to show that Heacock was concealing from the IRS in sixteen different ways the nature and extent of his bookmaking operation between 1980 and 1992. Thus, in this case where the evidence from before the limitations period bears on the existence of the scheme to defraud, the evidence was properly admitted at trial. U.S. v. Ashdown, 509 F.2d at 797-98.[13]

(4)

Heacock next argues that his Fifth Amendment right against self-incrimination was violated when his own tape recordings of betting activity and his federal tax returns were introduced into evidence against him. He argues that the tape recordings were daily records of his gambling activity, which the government required him to keep, and that his tax returns were also documents that the government compelled him to prepare and file.

---

[13]Heacock admits that the evidence was properly admitted in count 11 of the indictment, which was a conspiracy to impede the IRS from learning his sources and amounts of gambling income and his cash transactions in violation of 18 U.S.C. § 371. He asserts, however, that the evidence from the 1985 search should have been suppressed for the purposes of count 1 (which was a scheme to conceal from the IRS in sixteen different ways the nature and extent of Heacock's bookmaking operation between 1980 and 1992 in violation of 18 U.S.C. § 1001), citing U.S. v. Smith, 740 F.2d 734 (9th Cir. 1984), for the proposition that the five-year limitations period does apply to § 1001. That case is properly distinguished from the present case, however, because it related to the false statements section of § 1001, and the present case relates to continuing schemes to defraud.

It is well settled that in order to assert a Fifth Amendment claim of this nature, Heacock would have been required to assert a privilege at the time he kept his records and filed his return. U.S. v. Haydel, 649 F.2d 1152, 1159 n.13 (5th Cir. 1981). To put Heacock's argument in its best light, however, we will construe this claim as an appeal under 26 U.S.C. § 4424, pursuant to which Congress granted taxpayers immunity from prosecutorial use of such tax information, except "in connection with the . . . criminal enforcement of any tax imposed by . . . title [26]." 26 U.S.C. § 4424(c).

Nonetheless, Heacock's claim still falls short of requiring reversal of the district court. First, as to the disputed tape recordings, Heacock stipulated that his recording and maintaining of the tapes were not required by law. As such, there can be no § 4424 violation. See U.S. v. Aucoin, 964 F.2d 1492, 1500 (5th Cir. 1992). Accordingly, the district court made no error in determining that these tape recordings of bets were not kept for lawful purpose but for unlawful purpose of "settling up" with bettors.

Second, with respect to the introduction of Heacock's gambling tax returns (as well as the tape recordings), 26 U.S.C. § 4424 provides that required records can be used "in connection with the . . . criminal enforcement of any tax imposed by . . . title [26]." Count one of the instant indictment (which was a scheme to conceal from the IRS in sixteen different ways the nature and extent of

-19-

Heacock's bookmaking operation between 1980 and 1992 in violation of 18 U.S.C. § 1001) and count eleven of the indictment (which was a conspiracy to impede the IRS from learning his sources and amounts of gambling income and his cash transactions in violation of 18 U.S.C. § 371) both constitute such a criminal enforcement of a tax. Accordingly, the judgment of the district court is affirmed on this issue.

(5)

The next issue presented is whether the district court abused its discretion in failing to apply the knock and announce rule to exclude evidence seized in the 1990 search of Heacock's residence. According to Heacock, in the 1990 search the police knocked his door down even though the police admitted that they did not fear any injury from Heacock and that they had no particular reason to believe that he personally would destroy evidence.[14] It is further undisputed that the police officers did not announce the purpose of their search prior to knocking the door down.[15] Heacock argues, therefore, that the evidence obtained in the 1990 search should

---

[14]The prosecution did establish that the police knew Heacock was home, and that he did not respond to their knock, and that in such circumstances evidence is often being destroyed.

[15]Detective Lt. Richard Cox testified about that search that he first knocked on the door, yelled "police" loud enough for Heacock to hear, and when there was not response after a reasonable wait, he had Officer Ladnier "hit" the door, but Ladnier bounced off. Cox then pounded several times on the door, repeatedly yelling "police, police, police," but still no one responded, so he had Ladnier, a large man, knock it open.

have been suppressed because of the violation of the knock and announce rule.

There is no question but that 18 U.S.C. § 3109 requires that the police knock and give notice of authority and purpose before forcible entry to one's premises.[16]  The government, however, points out that the 1990 search of Heacock's gambling premises was by state officers under a state warrant, and, argues that the search was not subject to federal procedures merely because one federal agent was present.  The government further argues--and the district court concluded--that the state search was constitutionally "reasonable" because the officers knocked and announced their presence several times before forcible entry, which was accomplished to prevent destruction of evidence.

In view of the fact that 18 U.S.C § 3109 has no application to a state search, the question becomes whether the Fourth Amendment itself requires that police announce their "purpose" before forcible entry.  It is clear that the ultimate question under the Constitution is simply whether the search is "reasonable."  Given the fact that the police clearly made their presence known before

_____

[16]Section 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109.

taking any forcible action, and given the possibility that a longer wait might well have resulted in the destruction of evidence, we cannot say that the district court abused its discretion in determining that the search in this case was reasonable.

(6)

Heacock, in an argument that might be described as lacking legal reasoning, contends that the evidence seized in the 1990 search should be suppressed because the state had no ownership claim to the property. It seems that the seized evidence was also the subject of a civil forfeiture proceeding in state court, and the state court had ordered the civil forfeiture proceeding dismissed. Heacock argues, therefore, that the police had no right to possess his personal property since no criminal charges were pending, and had no right to copy any tapes or keep any other items in the face of the court order dismissing the civil forfeiture proceeding. We reject this contention because Heacock has presented absolutely no authority in his one-page argument on this point. Consequently, this point has effectively been abandoned for the purposes of this appeal. L&A Contracting v. Southern Concrete Services, 7 F.3d 106, 113 (5th Cir. 1994).

(7)

Finally, Heacock next argues that the government should have been estopped from prosecuting him for money laundering under 18 U.S.C. § 1956 because he had a tax wagering stamp, filed his monthly 730 tax returns, and paid the government a two percent

excise tax.  It is clear, however, that "the payment of any tax imposed [on gamblers] with respect to any activity shall not exempt any person from any penalty provided by a law of the United States or of any State for engaging in the same activity."  26 U.S.C. § 4422.  Furthermore, 18 U.S.C. § 1956 punishes those who launder money derived from "unlawful activity."  Given that Heacock's activities were "unlawful" under state law,[17] and given that Heacock's estoppel argument is absolutely rejected by the Internal Revenue Code, this argument is meritless.[18]

IV

We conclude that the judgment of conviction in this case contains no errors.  The evidence fully supports Heacock's conviction under 18 U.S.C. § 1955 for operating an illegal gambling

---

[17]This activity was a felony under the Mississippi RICO statute.  See, infra, part (8).  Heacock argues that his money laundering conviction should be overturned because the Mississippi RICO statute, on which the money laundering conviction was based, is unconstitutional.  Heacock argues that the Mississippi RICO statute denies due process because it elevates a series of two misdemeanor gambling offenses to a felony, and he argues that punishment under the Mississippi RICO statute amounts to cruel and unusual punishment, given that it involves unnecessary and wanton infliction of pain, is grossly disproportionate to the severity of the crime, and is without penalogical justification.  This argument, supported by no authority, on its face is meritless if not frivolous.

[18]Although Heacock argued in his original brief that the district court violated the rule against double jeopardy in this case, Heacock abandoned this claim in his reply brief.  He insists, instead, that he intended to pursue this claim as one of vindictive prosecution.  First of all, any issue raised for the first time in the reply brief is waived.  U.S. v. Miller, 952 F.2d 866, 874 (5th Cir. 1992)  Furthermore, there is no evidence to support this claim of vindictive prosecution.

business with five or more persons.  Further, we hold that any use of the United States mail is sufficient to invoke federal jurisdiction under 18 U.S.C. § 1952, notwithstanding the intrastate destination of the mailings in this case.  Finally, we conclude that Heacock's several other points of error have no merit.  Consequently, we hold that the judgment of conviction is error-free, and therefore

A F F I R M E D.