**UNITED STATES of America, Appellee,**

v.

**Eugene RICCARDELLI and Thomas Dimiceli, Defendants-Appellants.**

**Nos. 1368, 1369, Dockets 86–1043, 86–1044.**

United States Court of Appeals, Second Circuit.

Argued May 30, 1986.

Decided July 7, 1986.

Rochman, Platzer & Fallick, New York City (Barry Fallick, of counsel), for defendants-appellants.

Kenneth I. Schacter, Asst. U.S. Atty. (Rudolph W. Giuliani, U.S. Atty. for S.D. N.Y., Warren Neil Eggleston, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, NEWMAN, Circuit Judge, and POLLACK, District Judge.*

MILTON POLLACK, District Judge:

Eugene Riccardelli and Thomas Dimiceli appeal from judgments of conviction entered on January 8, 1986, in the United States District Court for the Southern District of New York after a six-day jury trial before Richard Owen, Judge. Defendant Riccardelli was convicted on all four counts

---

\* Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

with which he was charged;[1] defendant Dimiceli was convicted on two counts[2] and found not guilty on three additional counts. A third co-defendant pleaded guilty to two counts and is not involved on this appeal. On January 10, 1986, Judge Owen sentenced Riccardelli to four years imprisonment on each count, to be served concurrently, and fined Riccardelli $5,000 on Count One, $10,000 on Count Two, and $10,000 on Count Three, for a total fine of $25,000. That same day, Judge Owen sentenced Dimiceli to eighteen months imprisonment on each count, to be served concurrently. We affirm.

Appellants were arrested, along with a number of other electrical contractors and electrical inspectors, as a result of investigations into corruption of New York City public servants employed to perform electrical safety inspections. Appellant Dimiceli was a field-level electrical inspector assigned to Brooklyn. From 1982 through 1984, appellant Riccardelli was the Brooklyn Borough Manager of electrical inspectors, and thus was Dimiceli's supervisor.

Appellants took bribes from private electrical contractors to facilitate departmental paperwork and to overlook code violations.[3] As electrical inspectors, Dimiceli and Riccardelli were entrusted with inspecting electrical installations performed by private electrical contractors to determine whether the work conformed to the New York City Electrical Code. The Code requirements were designed to avoid danger to the public from improper installations that increase the risk of electrical shock or fire.

 The only issue of any substance on this appeal is one of statutory construction and concerns whether appellant Riccardelli's repeated and systematic use of the United States mails,[4] even though none of these letters were delivered outside of the State in which they were posted, is sufficient to invoke federal jurisdiction under the Travel Act, 18 U.S.C. § 1952 (1982).[5] For the reasons stated hereafter, we hold that Congress intended *any* use of the United States mails to be sufficient to invoke federal jurisdiction under the Travel Act.

## DISCUSSION

From the beginning of the Republic, "the postal service [was] ... a principal means by which the people of the United States were bound together in loyalty to the central government." G. Cullinan, *The United States Postal Service* 40 (2d ed. 1973).[6] Recognizing this understanding, the Found-

1. Appellant Riccardelli was convicted on Count One of conspiracy to commit extortion under color of state right, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982), on Count Two of extortion in violation of the Hobbs Act in connection with a $1000 payment by an electrical contractor, on Count Three of using the United States mails to facilitate bribery, and thereafter continuing that unlawful activity, in violation of the Travel Act, 18 U.S.C. § 1952 (1982), and on Count Four of mail fraud in violation of 18 U.S.C. § 1341 (1982).

2. Appellant Dimiceli was convicted on Count Two of extortion in violation of the Hobbs Act in connection with a $1,000 payment made by an electrical contractor, and on Count Six of mail fraud.

3. As the district judge noted at sentencing, Riccardelli somehow was able to amass an estate valued at approximately a quarter of a million dollars, despite his modest civil servant's salary.

4. The use of the United States mails alleged is the mailing of Final Certificates of inspection, whose issuance Riccardelli had approved, from the New York City Bureau of Electrical Control's offices in Manhattan to the electrical contractor's office in Brooklyn.

5. No constitutional argument is or could be raised that Congress is without power to criminalize any use of the mails under these circumstances. *Badders v. United States,* 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916); *Ex parte Jackson,* 96 U.S. 727, 6 Otto 727, 24 L.Ed. 877 (1878). The question rather is whether Congress intended to do so.

6. George Washington was conscious of the unifying potential of the mails, noting that "[t]hese [frontier] settlers are on a pivot and the touch of a feather would turn them away .... Let us bind these people to us with a chain that can never be broken." G. Cullinan, *supra,* at 29. In fact, when reorganizing the postal establishment, George Washington personally surveyed some proposed post roads. *Id.*

ing Fathers [7] expressly granted Congress the power "[t]o establish Post Offices and post Roads." U.S. Const. art. I, § 8, cl. 7. Indeed, from the days of President James Monroe through those of President Richard Nixon,[8] the Post Office Department was considered a separate executive department, with the Postmaster General being a Cabinet-level officer. G. Cullinan, *supra,* at 51. Thus, appellant Riccardelli's phrase "intrastate mails" is an oxymoronic juxtaposition. Use of the United States mails, whether to mail a letter across the street or across the nation, historically has been recognized by Congress as use of an exclusively federal instrumentality.

A plain reading of the Travel Act (the "Act") reveals no indication that the mailing referred to therein need be interstate to invoke federal jurisdiction. The Act, Pub.L. No. 87–228, § 1(a), 75 Stat. 498 (1961) (codified, as amended, at 18 U.S.C. § 1952), currently provides that:

§ 1952 Interstate and foreign travel or transportation in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

(c) Investigations of violations under this section involving liquor shall be conducted under the supervision of the Secretary of the Treasury.

The positioning of the phrase "including the mail" in the statute singles out the mails for special treatment and thus, consistent with the historical understanding of the United States mails, equates the use of the mails with the use of other facilities of interstate and foreign commerce; it does not indicate that the mailing itself must be interstate. A review of the legislative history of the Travel Act supports this reading of the statute.

As originally proposed by Attorney General Robert Kennedy, as part of an overall legislative program aimed at reaching organized criminality, *see generally* Pollner, *Attorney General Robert F. Kennedy's Legislative Program to Curb Organized Crime and Racketeering,* 28 Brooklyn L.Rev. 37 (1961), and as introduced in the Congress as parallel bills, S. 1653 and H.R. 6572, the bill that eventually was enacted as the Travel Act, *i.e.,* S. 1653, proscribed only travel in interstate commerce with intent to engage in certain illegal activities:

§ 1952 Interstate and foreign travel in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce with intent to ...

---

**7.** Before the Revolution, from 1753 through 1774, Benjamin Franklin served as the British Crown's co-postmaster general for the colonies. G. Cullinan, *supra,* at 21–25. In 1775, Benjamin Franklin was appointed the first Postmaster General of the official American postal service. *Id.* at 26.

**8.** On August 12, 1970, President Nixon signed the Postal Reorganization Act into law, ending the existence of the Post Office Department and beginning the United States Postal Service, a government-owned corporation. G. Cullinan, *supra,* at 1.

*See* 107 Cong.Rec. 13,942–43 (1961).[9] Throughout the portions of the hearings related to these two bills, however, Members of Congress (and witnesses) expressed concern over whether the federal jurisdictional provision of the proposed legislation, *i.e.*, travel in interstate commerce, was sufficiently broad to ensure that the purpose of the statute, enabling the federal government to assist the states in eliminating organized criminality, would be accomplished. *See e.g., Hearings Before the Senate Judiciary Committee on the Attorney General's Program to Curb Organized Crime and Racketeering,* 87th Cong., 1st Sess. [hereinafter cited as *Senate Hearings*] 111 (1961) (statement of Sen. Hart) ("our questions indicate you [the Justice Department] haven't made it [S. 1653] broad enough."); *id.* (statement of Sen. Keating) ("Is there any reason other than the practical one [of getting a bill through Congress] why you [the Justice Department] would not feel like going further than S. 1653, and including the use of other interstate facilities?"); *id.* at 259 (statement of Sen. Keating) ("all these gamblers will do if this statute is passed is send the proceeds through the mail . . .").[10]

On the House side, Post Office Officials testified before the House subcommittee on related bills and urged that Congress prohibit use of the mails in the same way it was prohibiting use of other federal facilities in connection with certain specified conduct. *See* letter of H.W. Brawley, Acting Postmaster General, to Chairman of House Judiciary Subcommittee No. 5, dated May 16, 1961, *reprinted in House Hearings, supra* note 9, at 122 ("If as I think it should, the Congress prohibits the interstate shipment of all these articles, it should also prohibit their transmission through the mails. This action would allow the postal service to complement activities of the Department of Justice when the mails are involved."); *see also House Hearings, supra* note 9, at 123.

Significantly, in the approximately seven hundred pages of testimony before the House and Senate committees, and the numerous references to the mails contained therein, there is not the slightest indication that Congress intended that use of the mails be interstate before federal jurisdiction is invoked.

A striking indication that Congress intended that the Travel Act apply to *any* use of the mails is the bill upon which the amended language of S. 1653 is based, S. 710, dealing with conspiracy, from the same Congress:

§ 373. Conspiracy to commit organized crime offense against any of the Several States

If two or more persons conspire to commit any organized crime offense against any of the several States, and one or more of such persons, to effect the object of the conspiracy, delivers for shipment or transports in interstate commerce any article, *or deposits in the mail or sends or delivers by mail any letter, package, postal card, or circular,* or transmits or causes to be transmitted in interstate commerce any message or communication by wire or radio, or receives any article, letter, package, postal card, circular, message, or communication after such shipment, transportation, sending, delivery, or transmission, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . .

*Reprinted in Senate Hearings, supra,* at 95 (emphasis added).[11]

---

9. S. 1653, in its original, unamended form, is identical to H.R. 6572. *See Hearings Before Subcommittee No. 5 of the House Judiciary Committee on Legislation Relating to Organized Crime,* 87th Cong., 1st Sess. [hereinafter cited as *House Hearings*] 9 (1961).

10. *See also Senate Hearings,* at 114 (statement of Sen. Keating); *id.* at 112 (statement of Herbert

Miller, Assistant Attorney General, Criminal Division, Department of Justice); *id.* at 93 (statement of Mr. King, attorney).

11. S. 710 is identical to H.R. 5230, from the same Congress. Neither of these bills were enacted into law.

Senator Keating, the sponsor of S. 710 (he referred to it in the hearings as "my bill," *id.*), also drafted and proposed the amended language regarding use of the mails that ultimately was adopted into the Travel Act. *See* S.Rep. No. 644, 87th Cong., 1st Sess. [hereinafter cited as *Senate Report*] 4 (1961). During the hearings, Senator Keating continually hammered at the inadequate jurisdictional scope of S. 1653, *see e.g., supra* note 10 and accompanying text, and pressed for expansion of the Act, along the lines of S. 710, to other federal facilities of commerce, including the mails. After the hearings, the Senate Committee on the Judiciary entrusted the task of drafting appropriate, expansive language to Senators Keating and Ervin. *See Senate Report*, at 4. As a result of Senator Keating's efforts, a new section 2 was added to S. 1653:

Sec. 2 Transportation in commerce in aid of racketeering enterprises.

(a) Whoever uses any facility for transportation in interstate commerce, including the mail, with intent to ...

*Id.* at 5. When the bill reached the Senate floor for a vote, Senator Keating rose to speak in support of the bill, as amended, noting that:

The original proposal of the Department of Justice, of course, was limited solely to travel, which would have been very inadequate and easily avoided. Even with its extension to transportation *including the use of the mail*[,] [a]s embodied in the amendment which I offered in the committee, there is still some danger that the bill will not be as inclusive as is necessary to be completely effective.

107 Cong.Rec. 13,943 (1961) (emphasis added). Thus, although the federal jurisdictional hook had been significantly broadened by the amendment, especially by proscribing use of the mails, the substantive offenses prohibited in the bill were too underinclusive for Senator Keating, *e.g.*, it

did not include a prohibition on murder-for-hire. *Id.*

The House amended the bill by combining the two sections of S. 1653 together "but [in this respect] ma[de] no substantive change in the provisions of the bill. H.Rep. No. 644, 87th Cong., 1st Sess. 1, *reprinted in* 1961 U.S.Code Cong. & Ad.News 2664. Thus the House adopted the Senate's broadening of the bill to include any use of the mails.[12] The bill passed in this form and was signed by the President.

A further indication of congressional intent that any use of the mails be sufficient to invoke federal jurisdiction under the Travel Act can be gleaned from the recently-enacted murder-for-hire statute, 18 U.S.C. § 1952A (Supp. II 1984), Pub.L. No. 98–473, Title II, § 1002(a), 98 Stat. 2136 (1984). *See United States v. Carpenter*, 791 F.2d 1024, 1030 (2d Cir.1986) (finding "persuasive" a subsequent Congress' view on the interpretation of a previous enactment). The House Report accompanying the statute states that:

Section 1952A follows the format of present section 1952. Section 1952A reaches travel in interstate or foreign commerce *or use of the mails* or of a facility in interstate or foreign commerce with intent that a murder be committed in violation of State or Federal law.

H.Rep. No. 1030, 98th Cong., 2d Sess. 306, *reprinted in* 1984 U.S.Code Cong. & Ad. News 3182, 3485 (emphasis added).

Appellant Riccardelli's federalism arguments are misplaced since once the federal jurisdictional nexus of the use of the mails is present, "the statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement." *Perrin v. United States*, 444 U.S. 37, 50, 100 S.Ct. 311, 318, 62 L.Ed.2d 199 (1979). In addition, since congressional intent is clear, the rule of construction of criminal statutes in favor of lenity is inapplicable. *See id.*, at 49 n. 13, 100 S.Ct. at 317 n. 13.

12. Because the House and Senate versions of the bill differed (in respects unrelated to the question of the mails), a conference committee was held to settle the differences. *See* H.Rep. No. 1161, 87th Cong., 1st Sess. (1961), *reprinted in* 107 Cong.Rec. 18,814–15 (1961).

In light of our holding today that Congress intended the Travel Act's federal jurisdictional nexus to be satisfied by *any* use of the mails, we reject contrary holdings in prosecutions under the Travel Act decided in the district court, only one of which is a reported decision. *See United States v. Varbaro*, 597 F.Supp. 1173, 1174–79 (S.D. N.Y.1984).

We have considered appellants' remaining claims and find them to be without merit.

Affirmed.