**UNITED STATES of America**

v.

**Richard D. GOLDBERG, Defendant.**

**Criminal Action No. 95–10223–RCL.**

United States District Court,
D. Massachusetts.

May 31, 1996.

Morris M. Goldings, Alice E. Moore, David R. Kerrigan, Mahoney, Hawkes & Goldings, Boston, MA, for Defendant.

Michael Kendall, United States Attorney's Office, Boston, MA, for the U.S.

## OPINION

LINDSAY, District Judge.

The defendant, Richard D. Goldberg, has moved to dismiss an indictment of him for, inter alia, mail fraud (18 U.S.C. §§ 1341, 1346) and violation of the Travel Act (18 U.S.C. § 1952). He argues that his prosecution under these statutes violates "the principles of federalism and the Tenth Amendment." Specifically, he claims that the mail fraud statute is unconstitutional because it allows for federal prosecution of an act that is not prohibited by federal law, and that the Travel Act, as applied to his case, fails to meet the constitutional standards for "affecting commerce." [1]

Goldberg's federalism argument may be divided into two broad categories, based on two Supreme Court cases, *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97

---

**1.** Yesterday, the Court of Appeals for the First Circuit decided *United States v. Sawyer*, 85 F.3d 713 (1st Cir., 1996). Where that case affects the rulings in this case, such changes have been noted and discussed in this opinion. Nothing in the *Sawyer* opinion changes the outcome of this motion.

L.Ed.2d 292 (1987) and *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *McNally*, the Supreme Court voiced federalism concerns about legislation such as that at issue in that case, and directed that Congress speak precisely in enacting any similar, future legislation; Goldberg's first argument is that, in enacting 18 U.S.C. § 1346, Congress failed to do what *McNally* requires. Because of this failure, Goldberg argues, this court must find § 1346 unconstitutional. Goldberg attempts to bolster his argument with the additional, subsidiary argument that "the alleged acts [in the indictment] would not constitute a federal offense if federal, and not state, legislators were involved." Defendant's Memorandum of Law in Support of Motion to Dismiss the Indictment on Federalism Grounds ("Defendant's Memorandum of Law") at 4.

Most circuits, including this one, have explicitly recognized that § 1346 overrules *McNally*. This court concludes that, for the reasons set forth below, Goldberg's argument is unsupported by *McNally* itself, or by the cases preceding and following it.

In the second part of Goldberg's argument (the *Lopez* argument), Goldberg claims that his challenged activity is "inherently local" and does not "substantially affect" interstate commerce, such that it meets *Lopez*'s requirements for congressional regulation under the commerce clause. After considering *Lopez* and the cases cited by Goldberg, the court concludes that Goldberg does not make a claim that would justify dismissing the indictment.

The court will address these arguments in turn.

Goldberg also makes an argument based on a paragraph he excerpts from the Supreme Court's opinion in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). He contends that the statement in *Garcia* that "Federal supervision over either the legislative or the judicial action of the States is in no case permissible ...," *Garcia*, 469 U.S. at 549–50, 105 S.Ct. at 1017, means that "[f]ederal review of state legislative services falls into the same unacceptable and unconstitutional category." Defendant's Memorandum of Law at 3. Even if this argument had merit, it does not apply to the facts of this case. What is at issue is not "federal review of state legislative services," but an alleged violation of state ethics laws by someone who is not even a state legislator. Therefore, the court is unpersuaded by this line of argument.

## I. *Facts*

In July of 1995, a federal grand jury indicted Goldberg on various charges (including mail fraud, wire fraud, violation of the Travel Act, and conspiracy) in connection with what the government contends was the provision of illegal gratuities to members of the Massachusetts Legislature.[2] The government alleges that Goldberg attempted to influence members of the Legislature improperly in his efforts to get favorable treatment by the Legislature with respect to certain property he owned. Goldberg is the owner of a valuable off-site parking lot at Boston's Logan Airport. During the period covered by the investigation that resulted in this indictment, the Commonwealth of Massachusetts was considering taking the lot by eminent domain for use in a major highway construction program called the Central Artery/Third Harbor Tunnel Project. Goldberg was allegedly seeking to influence the Massachusetts Legislature to approve an alternate route for the construction that would not require taking his property, or to influence the Legislature to approve better terms and compensation for the taking of his property than he could have received in the eminent domain procedure.

Specifically, Goldberg allegedly allowed a one or more legislators to use, without paying for it, a summer vacation home Goldberg had rented. The house, a rental property, is located in this Commonwealth, on Cape Cod; all the principals involved (Goldberg, the

---

**2.** Specifically, Goldberg is charged with violating the following statutes: 18 U.S.C. §§ 2, 371, 1341, 1343, 1346, and 1952.

Legislator(s), and a lobbyist) are also located in Massachusetts. The owner of the vacation home resides out of state.

## II. *Argument and Analysis*

### A. *McNally Argument*

#### 1. *"Intangible Rights" Doctrine Defined*

Goldberg seeks to take advantage of some judicial confusion over the status of what is known as the "intangible rights doctrine" under the mail fraud statute. This doctrine originated in court decisions to the effect that the mail fraud statute applied to schemes "to defraud citizens of their 'intangible rights to honest and impartial government.'" *United States v. Silvano*, 812 F.2d 754, 759 (1st Cir.1987), *quoting United States v. Gray*, 790 F.2d 1290, 1294 (6th Cir.1986), *and citing United States v. Von Barta*, 635 F.2d 999, 1005–06 (2d Cir.1980), *cert. denied* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Mandel*, 591 F.2d 1347 (4th Cir.1979), *aff'd in relevant part*, 602 F.2d 653 (en banc), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Keane*, 522 F.2d 534 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. States*, 488 F.2d 761, 766 (8th Cir.1973), *cert. denied*, 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). The doctrine allowed for prosecution of public officials for depriving citizens of these "intangible rights" and was "premised upon an underlying theory that a public official acts as 'trustee for the citizens and the State and thus owes the normal fiduciary duties of a trustee ...' to them." *Silvano*, 812 F.2d at 759, *quoting Mandel*, 591 F.2d at 1363.

*Silvano* provides the First Circuit's pre-*McNally* reasoning on this issue. The defendants in that case, a Boston city official and a friend of his, were convicted of mail fraud for attempting to get kickbacks from the city's health insurance provider. Silvano argued that "Congress did not intend to extend the mail fraud statute, 18 U.S.C. § 1341[3], to local political matters, absent a particular

federal interest." *Silvano*, 812 F.2d at 758. He claimed that

> the purpose of the statute was to curb swindles and securities fraud, not corruption in local government. Application of the mail fraud statute to this case, which ... involves "only a tenuous or contrived connection to federal law" is ... well beyond the contemplation of Congress and contravenes the basic principles of federalism and criminal law.

*Id.* The First Circuit flatly disagreed with this contention:

> The Supreme Court rejected this federalism argument long ago. *Badders v. United States*, 240 U.S. 391 [36 S.Ct. 367, 60 L.Ed. 706] (1916) [parallel citations omitted] (Whatever the limits to its power, Congress may forbid putting letters into the post office when such acts are "done in furtherance of a scheme that it regards as contrary to public policy, whether it can forbid the scheme or not."). See also *Parr v. United States*, 363 U.S. 370 [80 S.Ct. 1171, 4 L.Ed.2d 1277] (1960) [parallel citations omitted]. This court has specifically stated that Congress enacted the mail fraud statute to protect the integrity of the mails and that it reaches use of the mails "to implement fraudulent schemes directed at a state agency." *United States v. Rendini*, 738 F.2d 530, 533 (1st Cir.1984). [citations omitted.]

*Id.* The court then decided that "the mail fraud statute proscribes use of the mails to defraud a state and its citizens" of the intangible right to honest and impartial government. *Id.* at 759. The reasoning in *Silvano* would decisively foreclose Goldberg's current federalism argument, were it not for a rather confusing subsequent history for the "intangible rights" doctrine.

#### 2. *McNally and 18 U.S.C. § 1346*

During the same year in which *Silvano* was decided, the Supreme Court decided *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), a case in which a Kentucky state official was involved in a self-dealing patronage scheme and was

---

3. The section at issue in this motion, 18 U.S.C. § 1346, was added to the mail fraud statute after

*Silvano* was decided, and clarifies the prohibition set forth in 18 U.S.C. § 1341.

prosecuted under the mail fraud statute, 18 U.S.C. § 1341, on the intangible rights theory. The Supreme Court, relying in large part on the sparse legislative history of the mail fraud statute, rejected the intangible rights doctrine as being both overly vague and unsupported by the legislative history. The Court limited prosecutions under the mail fraud statute to those involving the misappropriation of "property" rights. *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

The Supreme Court narrowed the import of *McNally* with its decision in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). *Carpenter* involved a *Wall Street Journal* reporter who sold stock tips that were to be published in the newspaper before the information was published. In that case, the Supreme Court reasoned, that although the item stolen was "intangible," it was also "property." Thus, the defendant in *Carpenter* was held to be punishable under the mail fraud statute.

*Carpenter*'s effect on *McNally* was substantial. As one commentator states,

> the holding in *Carpenter* served to narrow the *McNally* decision to the precise circumstance of the absence of injury to *any* property right, tangible or intangible. These decisions established, therefore, that depriving an employer, public or private, of loyal services was not within the scope of the mail fraud statute . . .

Stanley S. Arkin et al., *Business Crime* ¶ 32.03[2][b] (1995). This narrow scope, if left intact, would nonetheless cover Goldberg's case.

In the next year, however, Congress overruled *McNally* by statute when it enacted 18 U.S.C. § 1346. That Section defines the "scheme or artifice to defraud" element of a mail fraud claim to include "a scheme or artifice to deprive another of the intangible right of honest services." *Id.*

Senator Biden, then Chair of the Senate Judiciary Committee, clarified the import of this new section:

> This section overturns the decision in *McNally v. United States* in which the Supreme Court held that the mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials. The intent is to reinstate all of the pre-*McNally* caselaw pertaining to the mail and wire fraud statutes without change.

134 Cong.Rec. S17360–02 (daily ed., Nov. 10, 1988) (Senator Biden).

Though this statement and the statute itself seem straightforward, in truth the statute, at least, is anything but. Commentators agree that the statute is intended to resurrect pre-*McNally* caselaw;[4] and courts, including the Court of Appeals for the First Circuit, are in accord. *United States v. Sawyer,* 85 F.3d 713 (1st Cir., 1996) (*citing United States v. Grandmaison,* 77 F.3d 555, 565–66 (1st Cir.1996)). One of Goldberg's primary squabbles with the Government is over the precedential validity of the *Silvano* case. In light of this Circuit's very recent decision in *Sawyer* (recognizing that § 1346 "was intended to overturn *McNally* and reinstate the reasoning of pre-*McNally* caselaw holding that the mail fraud statute reached schemes to defraud individuals of the intangible right to honest services of government officials," *Sawyer,* 85 F.3d at 724 (*citing Grandmaison,* 77 F.3d at 565–66), this court rejects Goldberg's contention that *Silvano* is no longer controlling precedent.

Despite this apparent agreement about Congress' intent in enacting § 1346, however, the ongoing effects of *McNally* itself have been unclear. This is the crack through which Goldberg attempts to escape his indictment. The unanswered question of which

---

4. *See, e.g.,* Otto G. Obermaier & Robert G. Morvillo, *White Collar Crime: Business and Regulatory Offenses* (1994) ("When Congress enacted 18 U.S.C. § 1346 in 1988, it restored to prosecutors the option of charging mail fraud, based on a scheme to 'deprive another of the intangible right of honest services.' Thus, at a strike, such cases as *Mandel* and *Margiotta* once again became good law." *Id.* at § 9.02[1][f][ii] ); Arkin, *supra,* at ¶ 32.03[2][b] ("Since the passage of § 1346, a scheme to defraud is once again actionable if it is directed to a deprivation of . . . the right of honest and faithful services, governmental or otherwise." *Id.*).

Goldberg seeks to take advantage is, "[w]hether that language [of § 1346] in fact cures all the problems [that] surfaced in the months following the *McNally* decision. . . . [I]t is not necessarily clear that 'honest services' embraces all the intangibilities that government prosecutors might want to advance as bases for § 1341 prosecutions." B.J. George, Jr., *Contemporary Federal Criminal Practice* § 6–58 (2d ed. 1993); *see also* Obermaier & Morvillo, *supra* n. 4 at § 9.02[f][iv] ("The statute was widely seen and no doubt intended to reverse *McNally*. . . . Clearly, it reinstates earlier cases, such as *United States v. Margiotta*, that criminalized any breach of duty by a public or quasi-public official." *Id.*)

In a related vein, Goldberg also argues that § 1346 does not display a sufficiently clear intention to overcome the Supreme Court's admonition in *McNally* that Congress must "speak clearly" so that the federal government would not be in the position of legislating ethical and other normative conduct for state officials.

The question of which law—state or federal—governs the ethical issues that underlie *McNally* and similar cases has, until the First Circuit's recent decision in *Sawyer*, remained unanswered. As one commentator framed the question, it is

> What body of law gives rise to the "duty of honest services"? Is it agency law, state statutory law, or some version of federal common law? This question, long ignored, has been made explicit by Section 1346. If the answer is state law, then the substantive content of the mail and wire fraud statutes could vary across the country, but a federal common law of fiduciary duties has long been resisted by the Supreme Court.

Obermaier & Morvillo, *supra* n. 3, at § 9.02[f][iv].[5]

The *Sawyer* decision makes great strides toward answering these questions, as they pertain to the elements of a § 1346 case. Specifically, that decision dictates that, though it is not necessary that the government prove a violation of the underlying state law, *Sawyer*, 85 F.3d at 722 (*citing Silvano*, 812 F.2d at 759), the government must prove that "the target of the scheme [to defraud] is the deprivation of the official's honest services." *Sawyer*, 85 F.3d at 725. The First Circuit went on to clarify that "[i]f the 'scheme' does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented." *Sawyer*, 85 F.3d at 725 (*citing United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.1994); *United States v. Von Barta*, 635 F.2d 999, 1005–06 n. 14 (2d Cir.1980), *cert. denied* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981)). "Honest services" are defined, in the *Sawyer* opinion, with reference to *United States v. Margiotta*, 688 F.2d 108, 142 (2d Cir.1982) (Winter, J., concurring in part and dissenting in part) and similar § 1346 cases. *Sawyer* (summarizing cases).

■ In other words, what the *Sawyer* opinion makes clear is that mere violation of a state ethics law, standing alone, does not suffice to establish the intent to deprive the citizenry of the "honest services" of a government official, and is therefore insufficient to establish a violation of the mail fraud statute. Something other than a state ethics law violation—for example, evidence of "the defendant's fraudulent intent," *Sawyer*, 85 F.3d at 725 (*citing D'Amato*, 39 F.3d at 1257) or the defendant's contemplation of "some actual harm or injury" (*citing Von Barta*, 635 F.2d at 1005–06)—is necessary to support a mail fraud conviction under § 1346.

Given *Sawyer*'s definition of the elements of "honest services" deprivation under § 1346, this court concludes that Goldberg's concern about federalized ethical standards is inapplicable. To be successful, a prosecution of Goldberg under § 1346 will require that the government prove more than mere state-law violations; the government will also be required to prove the intent to deprive the public of the official's honest services. By

---

**5.** Obermaier and Morvillo go on to state that "the view that fiduciary duties are defined by state law has been repeated on several occasions by the Supreme Court and is most forcefully stated in *Santa Fe Indus. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)." *Id.* at n. 130.

clarifying this element of a § 1346 charge, the First Circuit has eliminated any lingering federalism concerns and has answered the question of which law, state or federal, serves as the basis for a prosecution such as this one.

### B. Lopez Argument

#### 1. The Lopez Case

Congress is a body with limited, enumerated powers. One of those powers is that Congress may "regulate commerce with foreign Nations, and among the Several States, and with the Indian Tribes." U.S. Const., Art. I, § 8, cl. 3.

Last year, the Supreme Court heard and decided the first significant commerce clause case in decades. That case, *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), proved a surprising one; the Court struck down a subsection of a recent law, the Gun Free School Zones Act, 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V), as having an insufficient nexus to interstate commerce. That act made it a federal offense for a person knowingly to possess a firearm within a certain radius of a school. In reasoning whether the act had sufficient basis in interstate commerce, the Court noted first that the section in question "is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, —— U.S. at —— ——, 115 S.Ct. at 1630–31. Next, the Court reasoned, the section "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.*

*Lopez* sets forth the three "broad categories of activity that Congress may regulate under its commerce power." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629. Those three categories are as follows: "First, Congress may regulate the use of the channels of interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629 (citing cases). "Sec-ond, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* (citing cases). "Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *Id.* at —— —— ——, 115 S.Ct. at 1629–30.

The Court in *Lopez* summarized what it admitted was uneven caselaw on whether activities in the third category must "affect" or "substantially affect" interstate commerce, then held that "substantially affect" was the standard. *Id.* at ——, 115 S.Ct. at 1630.

The First Circuit has not yet published an opinion devoted to interpreting *Lopez*.[6] The other courts of appeals that have construed the case do not speak with one voice on issues relevant to Goldberg's case: first, does the inclusion of a "jurisdictional element" in the statute provide a sufficient commerce nexus by requiring a case-by-case analysis of the activity's relation to commerce, or is the inclusion of a jurisdictional element merely indicative of a likely-sufficient commerce nexus? Second, does *Lopez* require that *any* congressional regulation under the commerce clause "substantially affect" commerce, or does that test apply only to the third category of regulation (substantial relation to interstate commerce)?

#### 2. Requirements of the Travel Act

The Travel Act, 18 U.S.C. § 1952, provides (in relevant part):

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to— ... (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, or any unlawful activity, and thereafter performs or attempts to perform any of the acts specified [above], shall be [fines and maximum sentences omitted]. (b) As used in this

---

**6.** The Circuit did recently refer to *Lopez*, in its opinion in *United States v. Diaz–Martinez*, 71 F.3d 946, 952 (1st Cir.1995). The brief discussion in that case supports the interpretation put forward here: that a jurisdictional element in a statute, taken alone, is sufficient to bring the statute within the proper reach of Congress' commerce clause power.

section "unlawful activity" means ... (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 1952.

■ This court understands Goldberg to be attacking the charges against him on the following grounds: first, he claims that the Travel Act violates some general principle of federalism by allowing the federal government to "regulate state legislative services." This is the same argument Goldberg attempts to make above, under *McNally*. It relies on his expansive reading of *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) and on what he perceives as *Lopez*'s increased attentiveness to states' rights. *Garcia*, from which Goldberg cites a single sentence, is inapposite for the reasons discussed above. *Lopez* is distinguishable on its own terms. This first argument must therefore fail.

■ Goldberg's second ground for challenging his Travel Act prosecution is that "[a]ctions may only constitute a federal offense under the Bribery Act [sic] if the interstate acts are central to the scheme, not 'incidental' to it." Defendant's Memorandum of Law at 9. This argument fundamentally mischaracterizes applicable law. The First Circuit has stated that "[t]here is 'no requirement that the use of the interstate facilities be essential to the scheme: it is enough that the interstate travel or the use of interstate facilities make easier or facilities [sic] the unlawful activity.'" *United States v. Arruda*, 715 F.2d 671, 681–82 (1st Cir.1983), *quoting United States v. Wander*, 601 F.2d 1251, 1256 (3d Cir.1979) (internal citation omitted). Goldberg's alleged use of the mail to advance his scheme meets the "make easier or facilitate" standard. Thus, his argument on this second point must also fail.

Goldberg's third argument is that "all of the alleged significant conduct underlying this indictment was local," Defendant's Memorandum of Law at 10, and that therefore there is an insufficient commerce nexus to support federal jurisdiction. He argues that the house is local, and therefore not involved in commerce, and that the activities were local. This court concludes that Goldberg cannot prevail on either of these arguments, for the reasons discussed below.

### 3. Interpreting Lopez—Test of Commerce Nexus

■ As noted above, this court reads *Lopez* as denominating three categories of congressional power under the commerce clause. Activities whose regulation falls into the third category, "activities having a substantial relation to interstate commerce," must "substantially affect" interstate commerce in order for their regulation to be proper. Activities whose regulation falls into the first and second categories ("the use of the channels of interstate commerce" and "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities") are not subject to the "substantially affect" test, since they contain a "jurisdictional element" to ensure that, in any given case, there is a sufficient commerce nexus to support the regulation. The reason for this distinction, as explained by the *Lopez* Court, is that such a jurisdictional element "ensure[s], through case-by-case inquiry, that the [alleged violation] in question affects interstate commerce." *Lopez*, —— U.S. at ——, 115 S.Ct. at 1631.

This interpretation is supported by the Eighth Circuit's decision in *United States v. Robinson*, 62 F.3d 234 (8th Cir.1995). In that case, the court was asked to rule on the constitutionality, under the commerce clause, of the federal carjacking statute (18 U.S.C. § 2119). After briefly explaining *Lopez*, the court distinguished it:

First, the carjacking statute, on its face, regulates an item in interstate commerce: the statute addresses only the taking by force of motor vehicles that have been "transported, shipped, or received in interstate commerce." 18 U.S.C. § 2119. Therefore, *the carjacking statute fits squarely within the second category of activities regulable by Congress under the commerce clause, not requiring a separate showing that the intrastate activity substantially affects interstate commerce.*

Second, the statute, by virtue of the same provision, included the requirement of a case-by-case showing of a nexus between the intrastate activity and interstate commerce; if the government cannot show that the motor vehicle was transported, shipped, or received in interstate commerce, an element of the carjacking crime has not been proven, and the statute will not apply.

*Id.* at 236–37 (internal footnote and citation omitted; emphasis added).

Most cases since *Lopez* have been "third category" cases, so the question of whether activities in the second category must "substantially affect" interstate commerce has not often arisen. Some courts have considered statutes having a "jurisdictional element" under the third category analysis ("substantial effect"), while other courts find the inclusion of a jurisdictional element alone sufficient to satisfy the requirements of the commerce clause and remove the statute from the third category. *Compare United States v. Pappadopoulos*, 64 F.3d 522 (9th Cir.1995) (federal arson statute containing jurisdictional requirement reviewed under third category "substantial effect" test; statute unconstitutional as applied to private home) *with United States v. Sherlin*, 67 F.3d 1208 (6th Cir. 1995) (the arson statute, "[u]nlike the unconstitutional statute in *Lopez*," "does contain a jurisdictional element, which ensures, through proper inquiry, that the arson in question affects interstate commerce," *id.* at 1213; statute constitutional as applied to university building) *and United States v. Martin*, 63 F.3d 1422 (7th Cir.1995) (same federal arson statute held constitutional as applied to rental property; citation to *Lopez* as potentially affecting jurisdictional conclusion that rental property is per se "in commerce" and therefore satisfies commerce nexus; no discussion of *Lopez* categories); *see also United States v. Bell*, 70 F.3d 495 (7th Cir.1995) (distinguishing statute regulating possession of a firearm by a felon [18 U.S.C. § 922(g)(1)] from statute at issue in *Lopez* because § 922(g)(1) has "an explicit requirement that a nexus to interstate commerce be established"; there was no discussion of categories and no "substantial effects" inquiry. *Id.* at 498.)

This Circuit appears (though the brevity of its discussion leaves the matter somewhat unclear) to have taken the latter approach—that is, that a statute which includes the jurisdictional element need not satisfy the "substantial effects" test. *United States v. Diaz–Martinez*, 71 F.3d 946 (1st Cir.1995) (refusing to indulge *Lopez* challenge to statute which "contains a specific requirement that the [item at issue] have been 'shipped or transported in interstate or foreign commerce'" *id.* at 953, citing 18 U.S.C. § 922(k)); *see also United States v. Lowe*, 924 F.Supp. 318 (D.Mass.1996) (upholding constitutionality of carjacking statute under second-category type analysis, noting that the statute "includes a[] ... jurisdictional limitation that ... excludes it from the reach of *Lopez*." *Id.* at 320).

The Third, Eighth, and Tenth Circuits have also considered post-*Lopez* challenges to statutes' constitutionality, as follows: The Third Circuit, considering the federal carjacking statute (18 U.S.C. § 2119), found without discussion that the statute fell into the third category, and applied the "substantial effects" test, noting that the statute had a jurisdictional element. *United States v. Bishop*, 66 F.3d 569, 576 (3d Cir.1995), *petition for cert. filed;* compare *Robinson*, cited above, in which the Eighth Circuit found the same statute fit into the second category, and did not apply the substantial effects test. The Eighth Circuit evaluated a federal ammunition-possession statute, 18 U.S.C. § 922(g)(1), under *Lopez, United States v. Mosby*, 60 F.3d 454 (8th Cir.1995). That court found that the "in or affecting [commerce] language in [the section at issue] makes clear that an individual case may fall into the second or third category." *Id.* at 465 n. 3. Under the facts of that case, the court found, the regulation fell within the second category. *Id.* The court did not perform any "substantial effects" test. The Tenth Circuit, evaluating a federal firearm statute (18 U.S.C. § 922(o)) under *Lopez*, first stated that the statute "embodie[d] a proper exercise of Congress' power to regulate 'things in interstate commerce,'" *United States v. Wilks*, 58 F.3d 1518, 1521 (10th Cir.1995), *citing Lopez*, —— U.S. at ——, 115

S.Ct. at 1629 (*Lopez*'s second category), then went on to cite another case for the proposition that the interstate flow of machineguns "not only has a substantial effect on interstate commerce; it is interstate commerce." *Wilks*, 58 F.3d at 1521, *citing United States v. Hunter*, 843 F.Supp. 235, 249 (E.D.Mich. 1994). Thus, it is not clear in *Hunter* whether the court's decision rests on second-category analysis alone, or on a combination of second-category analysis and the "substantial effects" test.

This barrage of cases demonstrates that caselaw is unsettled about the proper inquiry under a "second category" test, as well as the method for determining the category in which to place a particular statute.

 This court concludes that the Travel Act falls into *Lopez*'s second category, since the Act evidences Congress' regulation of "the instrumentalities of interstate commerce, or persons or things in interstate commerce," which is proper "even though the threat may come only from intrastate activities," *Lopez*, —— U.S. at ——, 115 S.Ct. at 1629. In reaching this conclusion, the court notes the following: (1) the U.S. mail is an "instrumentality" of interstate commerce, *United States v. Riccardelli*, 794 F.2d 829, 830 (2d Cir.1986)[7] and (2) a rental home is a "thing in interstate commerce," *United States v. Medeiros*, 897 F.2d 13 (1st Cir. 1990), *citing Russell v. United States*, 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985) ("rental property is per se property used in an activity affecting interstate commerce," *Medeiros*, 897 F.2d at 16.).

Therefore, this court is satisfied that the Travel Act constitutes a lawful exercise of Congress' power to regulate interstate commerce, as explained by the Supreme Court in *Lopez*.

For the foregoing reasons, the defendant's motion is DENIED.

So ordered.

---

**7.** Construing the Travel Act in this case, the Second Circuit stated, "Use of the mails, whether to mail a letter across the street or across the nation, historically has been recognized by Congress as use of an exclusively federal instrumentality." *Riccardelli*, 794 F.2d at 830. *See also* the Travel Act, 18 U.S.C. § 1952 (requiring use of "any facility in interstate or foreign commerce, *including the mail*," *id.*) (emphasis added). The Fifth Circuit has followed the Second Circuit in so holding. *United States v. Heacock*, 31 F.3d 249, 255 (5th Cir.1994). The courts agree that Congress has "the power to criminalize an intrastate use of the mail," *United States v. Barry*, 888 F.2d 1092, 1095 (6th Cir.1989); *see Heacock*, 31 F.3d 249; *Riccardelli*, 794 F.2d at 830 n. 5. By extension, the mail is an instru-

mentality of interstate commerce for commerce clause purposes.

For purposes of the Travel Act, and not the commerce clause, the question is less settled. The Sixth Circuit has also considered the question of whether an intrastate mailing suffices to invoke Travel Act jurisdiction, and came to the contrary conclusion. In *United States v. Barry*, 888 F.2d 1092 (6th Cir.1989), the court found that the limiting use of the word "in" in the Travel Act ("whoever ... uses any facility *in* interstate or foreign commerce ..." 18 U.S.C. § 1952), combined with that statute's legislative history, indicated that Congress intended to limit application of the Act to mailings that actually traveled in interstate commerce.